**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| PERCEPTION MARKETING, LLC, a New York Limited Liability Company, </br></br>  Plaintiff, </br></br> v. </br></br> INTERNAL REVENUE SERVICE OF THE UNITED STATES, JOHN BERSIN, an individual, and RICHARDSON STOOPS, RICHARDSON AND WARD, P.C., </br></br>  Defendants. | Case No. 04-CV-335-JHP-PJC |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case arises from the financial decline and failure of two businesses owned by John Bersin ("Mr. Bersin"). Those businesses are Impressions on Hold International, Inc. ("IOHI") and Pro Image Marketing, Inc. ("Pro Image"). At the time the businesses failed, Pro Image had failed to remit all of its employment taxes which were due and payable to the Internal Revenue Service ("the IRS") for the first and second quarters (January 1, 2001 through March 31, 2001, and April 1, 2001 through June 30, 2001) of calender year 2001. The parties agree that at the time of trial Pro Image owed the IRS money for the first and second quarters of 2001, for a combined total of $101,213.30.

In the instant case, the IRS attempts to seize assets to which Mr. Bersin claims he is the legal owner, in order to pay the employment tax obligation of Pro Image.[1] Those assets consist of approximately $110,000 which represents the proceeds of a note payable to Mr. Bersin by Perception Marketing, LLC ("Perception"). These funds were previously interplead into this Court by Perception

---

[1] The parties acknowledge and agree that Mr. Bersin may have liability separate from that of Pro Image for the "trust liability" of a control person who fails to remit taxes owed by a corporation. The parties further agreed and stipulated, however, that Mr. Bersin's "trust liability," if any, is not an issue in this case and that it is not to be determined by the Court in this matter.

when the IRS notified Perception that it claimed a lien on proceeds of the note payable to Mr. Bersin ("the Interpleaded Fund").

The IRS asserts that it is entitled to the Interpleaded Fund under two separate theories. First, the IRS claims the Interpleaded Fund under the Equitable Trust Fund Doctrine. *United States v. Van Diviner*, 822 F.2d 960, 965 (10th Cir. 1987); *Green v. Oilwell*, 767 P.2d 1348 (Okla. 1989). Essentially, this doctrine provides that an insider of an insolvent corporation holds the assets of the insolvent corporation in trust for the creditors of the insolvent corporation. The second theory asserted by the IRS is that it has a lien against the Interpleaded Fund because its lien for Pro Image's unpaid employment taxes attaches to all property owned by Pro Image. *Diedrich v. Commissioner*, 457 U.S. 191, 195 (1982); *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945); *Rogers v. United States*, 281 F.3d 1108, 1116 (10th Cir. 2002)(citing *True v. United States*, 190 F.3d 1165 (10th Cir. 1999)); *Kornfield v. Commisioner*, 137 F.3d 1231, 1234 (10th Cir. 1998); *U.S. v. Scott*, 37 F.3d 1564, 1572 (10th Cir. 1994). The IRS asserts that because the promissory note payments to Mr. Bersin are, in fact, the traceable assets of Pro Image, the Interpleaded Fund is actually the property of Pro Image, not that of Mr. Bersin.

Mr. Bersin denies that the Interpleaded Fund is either the property of Pro Image, or that it is traceable to property of Pro Image. Rather, Mr. Bersin asserts that the Interpleaded Fund is his property by virtue of a settlement agreement in which Perception agreed to pay him, individually, the sum of $975,000.00.

Under either theory advanced by the IRS, it is obligated to prove that Pro Image has rights in and to the Interpleaded Fund. Therefore, the IRS has the burden of proving that the Interpleaded Fund is the property of Pro Image. After consideration of the testimony, evidence, stipulations, pleadings and briefs, the Court finds Mr. Bersin has carried his burden of proving the Interpleaded Fund belongs to him and the IRS has failed to prove that the Interpleaded Fund is the property of Pro Image. Pursuant to Rule 52, Federal Rules of Civil Procedure, the Court makes the following Findings of Fact and Conclusions of Law:

**FINDINGS OF FACT**

1. Pro Image was incorporated in 1991. IOHI was incorporated in 1994. During their existence, both corporations maintained separate corporate identities in that each maintained

separate books of account, separate tax identification numbers, and filed separate tax returns.

2. Pro Image and IOHI were collectively formed to operate an on-hold messaging business known as Impressions on Hold.[2]  To do this, IOHI sold franchises to franchisees.  As of the year 2000, IOHI had approximately seventy (70) franchisees.  The franchisees would sell the on-hold messaging product under the name Impressions on Hold.  Typically, the franchisee would receive approximately sixty percent (60%) of the sales price, and IOHI would receive approximately forty percent (40%) of the sales price.  The most common contracts with Impressions on Hold customers required Impressions on Hold to produce on-hold messaging for the customer for a period of three (3) years.

3.  In order to fill its obligation to provide on-hold messages, IOHI would contract with Pro Image and pay an up-front fee.  In turn, Pro Image maintained a sound studio and employees, hired contractors, and licensed music to produce the on-hold message required for customer fulfillment.  When completed, the message would be delivered to the customer by Pro Image.  Additionally, industry statistics reflected that the average on-hold customer changed its on-hold message an average of 5.2 times per year.  Under its contract with the customer, IOHI was obligated to produce an update customer on-hold message for the entire length of the contract.  Because IOHI paid a fee for this service to Pro Image, this customer obligation constituted a deferred liability on the balance sheet of Pro Image until the completion of the customer contract.

4. Until the year 2000, Impressions on Hold was a successful company.  Mr. Bersin had received various industry accolades for IOHI, and for his entrepreneurial ability in leading the company.  In 2000, however, a series of events occurred which caused Impressions on Hold to turn from being profitable to being highly unprofitable.  The events included the mass exodus of IOHI's

---

[2] The evidence before the Court reflects that the on-hold messaging business operated by Pro Image and IOHI operated under the name "Impressions on Hold."  IOHI sold franchises that permitted its franchisees to operate under the name "Impressions on Hold." Because Pro Image's business was to produce the on-hold messages sold by the franchisees, it was also permitted to use the name "Impressions on Hold."  The use of the name "Impressions on Hold" by Pro Image and IOHI's franchisees was permitted to prevent confusion in the mind of the customers.  In its Findings, the Court will refer to IOHI solely as the corporation called Impressions on Hold, International, Inc.  In using the term "Impressions on Hold," the Court is referring to the collective business operations of IOHI, its franchisees and Pro Image.

franchisees from its franchise system. When this occurred, the franchisees stopped selling on-hold messaging under the name Impressions on Hold. This, in turn, eliminated virtually all of IOHI's income since IOHI's income consisted almost entirely of the franchisor's portion of new customer sales.

5. Without new customer sales, Pro Image's business also suffered. With no new sales, there were no new customer messages for Pro Image to produce and, therefore, no income for Pro Image to pay its employees, or its other operational expenses. This required Pro Image to drastically reduce its work force and left it without sufficient income to pay its bills.

6. The elimination of income to Pro Image had other serious consequences. Under the terms of its agreement with IOHI, Pro Image still had the obligation, and the liability, to produce and update all on-hold messaging for Impressions on Hold's customers for the duration of their respective contracts. Without income and employees, Pro Image had insufficient means to do so.

7. By the second quarter of 2001, the failure of Impressions on Hold was imminent. Nonetheless, Mr. Bersin, and at least one of IOHI's franchisees, believed that IOHI's business concept remained viable. That franchisee operated under the Impressions on Hold name although the name of the underlying business was Two Creative, LLC ("Two Creative"). Two Creative was operated by Sheri David and Marissa Allen.

8. In 2001, Mr. Bersin, Ms. David, and Ms. Allen began discussing ways to salvage the Impressions on Hold business. They visited Tulsa, Oklahoma, to discuss possible solutions and observed that the former staff of over 100 employees had been reduced to a handful. While they were in Tulsa, Impressions on Hold's telephone service was shut off because of non-payment of its bill. Ms. David and Ms. Allen testified Mr Bersin's business was "in the toilet," and he was taking "the walk of shame."

9. As of the time of these discussions, there was no realistic chance that any person, or company, other than Ms. Allen and Ms. David would attempt to salvage the company. Because the secured creditors had security interests in the essential assets of IOHI and Pro Image, the companies could not have continued to operate if the security interests were foreclosed. At the time, virtually all of IOHI's assets, and Pro Image's assets, were pledged to creditors for obligations owed, and the liquidation value of the assets of IOHI and Pro Image were insufficient to pay the secured liabilities.

10. The solution to the impending collapse of Impressions on Hold that was negotiated among Mr. Bersin, Ms. Allen, and Ms. David, was that IOHI and Pro Image would sell their assets

to a newly formed entity named AMFYOYO, LLC ("AMFYOYO"). The Asset Sale Agreement ("the Agreement") was a fairly negotiated, arms-length agreement, and the preliminary recitations were agreed upon by the parties as setting forth an accurate state of affairs at the time the Agreement was created by the parties. The Asset Sale Agreement contains various recitations on pages 1 and 2, which the Court finds accurately reflected the state of Impressions on Hold.

11. The Agreement appeared to be advantageous for all parties since very few creditors would have gotten paid had the assets of IOHI and Pro Image been liquidated. Although the Agreement never formally closed, the parties began to operate Impressions on Hold in accordance with the Agreement. In doing so, AMFYOYO advanced approximately $139,492.78. In the Agreement, AMFYOYO also agreed to pay all of the secured creditors of IOHI, and Pro Image and many of its unsecured creditors. None of the money advanced by AMFYOYO was paid to Mr. Bersin. Instead, it was paid directly to the creditors of IOHI, and Pro Image. Additionally, AMFYOYO agreed to service all existing Impression on Hold customer contracts, which required it to assume over a million dollars in contingent liabilities. Under the circumstances that existed, the Court finds the Agreement was fair to the creditors of IOHI, and Pro Image, and that Mr. Bersin adequately discharged his responsibilities to those creditors by entering into the Agreement which maximized the amount of money to be paid to the creditors of IOHI and Pro Image.

12. After execution of the Agreement, the assets, management, and operation of Impressions on Hold, were transferred to AMFYOYO which began to carry on the business operations of Impressions on Hold.

13. After the operations of Impressions on Hold were assumed by AMFYOYO, the parties to the Agreement discussed the future structure of the operating entity for Impressions on Hold. Ultimately, Mr. Bersin, Ms. Allen, Ms. David, and a key Impressions on Hold employee, Dana Justus, formed Perception Marketing, LLC ("Perception Marketing") to be the operating entity.

14. Ms. Allen and Ms. David wanted Mr. Bersin to be a part of the new operating entity because of his substantial experience and expertise in forming and operating an on-hold messaging company. Mr.Bersin's contribution to Perception Marketing was to be his time, energy, efforts and sales leadership. Mr. Bersin did not contribute anything to Perception Marketing belonging to Pro-Image. For his future efforts, Mr. Bersin was to be rewarded with an annual distribution of profits, and other valuable consideration.

15. Soon after Perception Marketing's Operating Agreement was formed, the parties had

a disagreement. All parties were mutually distrustful of each other and disputes arose that caused a lawsuit to be filed which was removed to the United States District Court for the Northern District of Oklahoma, Case No. 02-216-P(M). Among other things, Mr. Bersin, who was the plaintiff in the lawsuit, sought to rescind the Asset Sale Agreement. The defendants in the lawsuit sought to enforce the Asset Sale Agreement. Eventually, the lawsuit was settled under the auspices of the Court's Alternate Dispute Resolution Program and a Settlement Agreement was entered between all parties to the lawsuit.

16. The Settlement Agreement essentially resolved two matters. One of the matters resolved included all issues arising under the Asset Sale Agreement. The other matter resolved was Mr. Bersin's ownership, association, and employment with Perception Marketing. As to the former, a comparison of the consideration IOHI and Pro Image received from the Settlement Agreement, to the consideration they were entitled to receive from the Asset Sale Agreement, reflects that Mr. Bersin actually negotiated and received additional consideration for IOHI and Pro Image in the Settlement Agreement that exceeded the consideration each was to receive under the Asset Sale Agreement. For example, in the settlement process, Mr. Bersin negotiated for Perception Marketing to discharge approximately $500,000 - 700,000 of debts that it was not required to pay under the original Asset Sale Agreement.

17. In addition to resolving issues related to the Asset Sale Agreement, the Settlement Agreement also resolved Mr. Bersin's employment, association and ownership of Perception Marketing. By entering into the Settlement Agreement, Mr. Bersin gave up all of his rights to an annual draw, a percentage ownership of Perception Marketing, a right to an annual distribution of profits, and other valuable consideration. For the relinquishment of these rights, Perception Marketing agreed, among other things, to give Mr. Bersin a five-year promissory note in the principal amount of $975,000.00, payable in bi-monthly installments. The promissory note was given to Mr. Bersin in for his ownership, association and employment rights with Perception Marketing. There is no evidence that this note was given to Mr. Bersin for any consideration provided to Perception Marketing by Pro Image. For this reason the Court finds that Mr. Bersin has met his burden of demonstrating that he is the owner of the Interpleaded Fund, and the IRS has failed in its burden of demonstrating that the Interpleaded Fund is the property of Pro Image.

18. In spite of the foregoing, the IRS contends Mr. Bersin received a partial customer list in the Settlement Agreement that constituted property of Pro Image. The Court rejects this claim

for three reasons. First, the record reflects that IOHI was the franchising arm of the business known as Impressions on Hold and was, therefore, the owner of the contracts and/or customer lists that were created as a result of a customer sale. On the other hand, Pro Image's function was to produce, for a fee received from IOHI, the messaging purchased by customers. There is no evidence from which the Court can conclude that Pro Image owned any portion of the customer list that Mr. Bersin received in the Settlement Agreement. Consequently, even if the customer list had value, there is no evidence that the "customer list" was property belonging to Pro Image.

19. The second reason the Court rejects the IRS's position with respect to the customer list is that there is no evidence in the record the customer list had economic value. The IRS offered no proof of the economic value of the customer list. Without proof of the value of the "customer list," the Court is left to speculate whether the customer list had value. The Court will not speculate on these points in the absence of evidence.

20. The third reason the Court rejects the IRS's position with respect to the customer list is that there is no evidence in the record which reflects the customer list had independent value. According to the testimony of Mr. Bersin, the customer lists were simply pieces of paper that contained the names of customers. Because customers had no obligation to pay money to Impressions on Hold, or any other obligation to Impressions on Hold, the "customer list," at its best, constituted only a future sales lead. On the other hand, Pro Image had a liability to continue to produce on-hold messaging for the duration of the customers' contacts which required an investment of time, money and resources. Only by servicing the customers' on-hold messaging requirements without remuneration, and only by investing financial and human resources in the customer list, could any person or business expect to ever receive a renewal or any other thing of value from the customer. Therefore, the Court finds the customer list received by Mr. Bersin was valueless and that only through Mr. Bersin's investment of knowledge, time, money and human resources could he have hoped to realize any profit from it. Consequently, Mr. Bersin's investment in the customer list, not its intrinsic value, is what provided the value, if any, that Mr. Bersin ultimately received from the list.

## CONCLUSIONS OF LAW

1. In order to prove his claim to the Interpleaded Fund, Mr. Bersin was required to demonstrate that he is the legal owner of the Interpleaded Fund. Mr. Bersin has demonstrated that

the Interpleaded Fund is the proceeds of a promissory note that was payable to him for consideration given by him. For this reason, Mr. Bersin has met his burden of proving that he is the legal owner of the Interpleaded Fund.

2. In order to prove that it has a superior claim to the Interpleaded Fund, the IRS was required to prove, under either of its legal theories, that the Interpleaded Fund was either the property of Pro Image, or that it was proceeds and, therefore, traceable to property belonging to Pro Image. The IRS has failed in its burden of proof in that it failed to prove by the greater weight of the evidence that the Interpleaded Fund is the property of Pro Image, or that it is traceable to property belonging to Pro Image. *Diedrich v. Commissioner*, 457 U.S. 191, 195 (1982); *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945); *Rogers v. United States*, 281 F.3d 1108, 1116 (10th Cir. 2002)(citing *True v. United States*, 190 F.3d 1165 (10th Cir. 1999)); *Kornfield v. Commisioner*, 137 F.3d 1231, 1234 (10th Cir. 1998); *U.S. v. Scott*, 37 F.3d 1564, 1572 (10th Cir. 1994); *United States v. Van Diviner*, 822 F.2d 960, 965 (10th Cir. 1987); *Green v. Oilwell*, 767 P.2d 1348 (Okla. 1989).

3. As an alternative, the IRS asserts that the Interpleaded Fund may be substituted for property of Pro Image that was received by Mr. Bersin. In particular, the IRS contends that, while the Interpleaded Fund may not be the property of Pro Image, Mr. Bersin received a valuable "customer list" belonging to Pro Image and that the Interpleaded Fund should be paid to the IRS as a substitute for the value of the customer list. The IRS has failed in its burden of proof on this theory for two reasons. First, the IRS has not proven that the "customer list" was the property of Pro Image. Rather, the Court finds that the "customer list" was the property of IOHL. Second, the IRS has failed to establish the value of the customer list, if any. To the contrary, Mr. Bersin has demonstrated by the greater weight of the evidence that the "customer list" had no independent value and that any value he derived from it was the result of his investment of financial resources and human resources. Accordingly, the Court finds that the IRS has failed to demonstrate that Mr. Bersin obtained any property of value belonging to Pro Image for which the Interpleaded Fund may be substituted.

4. Mr. Bersin is the owner of the Interpleaded Fund. The IRS has no lien against or any legal interest in the Interpleaded Fund.

5. The Interpleaded Fund should be restored to Mr. Bersin. The Clerk of the Court is directed to return the Interpleaded Fund to Mr. Bersin with all accrued interest.

6. The Court finds that Mr. Bersin is the prevailing party in this litigation and that he should be awarded his costs upon application.

**IT IS SO ORDERED this 14th day of October, 2005.**

*[signature]*
James H. Payne
United States District Judge
Northern District of Oklahoma